Good morning. I'm Amitai Schwartz, appearing on behalf of the appellant Jeffrey Subana. This is also related to the same events as the previous two cases. The two issues that I'd like to argue this morning are the issue of the readbacks and the absence of both the defendant and the defendant's counsel from what we would characterize as critical readbacks asked for by the jury, and then the second issue is the exploitation of the defendant's confession to convince another witness to undermine the alibi. I want to start with the readbacks issue because I think it's a little more confusing of the two issues and may benefit from the argument. The readback issue, of course, is that after all the evidence is in, on the second day of jury deliberations, the jurors ask to have various testimony reread. And initially, the defendant's counsel and all counsel stipulate that the court reporter can read back this testimony in the absence of both counsel and the defendants. Then the jury asks for additional readbacks, and these they stipulate over the telephone so they don't even have to bother coming to the courtroom. So there are two sub-issues here. The first is whether this procedure violated clearly established Supreme Court law, and then the second is whether it's prejudiced. There are two Ninth Circuit cases, of course, that deal with the issue of whether the defendant's presence at a readback is a critical stage of the proceedings and whether the Supreme Court of the United States has established clear law on that point. The first case, La Crosse, says no. The second case, Fisher v. Rose, says yes. The difference, they're about five months apart. Fisher v. Rose, the situation was that neither the defendant nor his lawyer, like in this case, were present. However, in that case, they weren't even asked to stipulate, and nobody knows, nobody knew what occurred during the course of the readback and the testimony. Well, except the court court apparently selected portions she wanted the jury to hear, and their suggestion on the record was the judge wasn't even around and may not have been asked. Well, I think that what the way I read the Court's decision in Fisher, and I realized, Your Honor, was on that panel, was that it was One of the hazards of arguing here is that I realized that, was that nobody could tell what happened in Fisher. And, in fact, that there was a, there were readbacks, but the Court was, all the courts were in a complete quandary. Well, it was a pretty egregious situation because counsel, nobody knew what was going on. By the way, Fisher there was not, I was not Fisher on the case. You were not. I'm sorry. But that's different from the situation. So tell me how you think we can, why we should analogize to what happened in Fisher and from what happened to what happened here. Well, because I think the emphasis, the emphasis, the way I reconcile Fisher and LaCrosse is that at least the defendant's counsel has to be present to watch what's going on. Somebody has to keep an eye on what goes on during these readbacks. And we tried to make the point quite clearly that when one looks at the clerk's minutes of what went on during these readbacks, which is actually in the record here, it doesn't make sense. We've got a court reporter reading one witness's long go. She's read, she read 60 pages in 40 minutes, about a minute and a half a page. Then on the next witness, Jenny Liu, she reads 60 pages in 32 minutes, which is almost impossible unless one is talking so fast and can read so fast. It leads to an inference like was something left out? Was something slurred over? Did the court reporter go into the jury room, start reading, and then one or more jurors said, oh, you can stop there. Does that account for the 32 minutes? Does that account for the 40 minutes? Obviously, we don't know. But that's why it's something that we have to know. As to the second set of readbacks, you've got the same court reporter reading 71 pages in 79 minutes. And on the second set of readbacks, which are Mario Nguyen and Sergeant Moore. Mario Nguyen is one of these witnesses who one of the previous counsel referred to as squirrely. And his testimony is all over the lot. It was very important to, if there was going to be a readback on that man's testimony, and my client, the rest of my client's life is on the line, that somebody should have been watching, whether it was counsel or whether it was counsel and the defendant, should have been watching what was going on there. And the same thing with Sergeant Moore. It's impossible, based on these numbers, and there's no reason to believe that the clerk got the numbers wrong, it's impossible to believe that the court reporter actually read exactly what the jurors asked for in their various notes. And the reason that it, I think, puts us over to the Fisher side of the line, as opposed to the La Crosse side, is because in La Crosse, at least you had the defendant, as far as I could read the opinion, you had the defendant's lawyer there, it doesn't say he was gone, that he was watching the store, he was watching what was going on, and there's no inference in La Crosse that there was any prejudice that it was denying a fair trial. The way this Court characterized the Supreme Court standard in Fisher, which we contend is controlling here, the way the Court characterized the Supreme Court standard is that it applies the defendant's presence is necessary to a, when it's necessary to a full and fair hearing, that is, an opportunity to defend against the charge. That's the Supreme Court standard that flows from the Snyder case, the Gagnon case, the Sane v. Russian, and so forth. And that's the case that this Court, that's the standard that this Court applied in, in Fisher. Here, had defendant's counsel, at least, been present, and had defendant been present, they could have monitored this 40 minutes of readback, this 32 minutes of readback, this two minutes per page, and ensured that there was a balance. I think that this Court's case has made quite clear that if there's going to be a readback, and of course the law is quite well established in the Ninth Circuit that this is a critical stage, you've got to keep your eye on what happens here. If there's going to be a readback, it has to be balanced, it has to be fair. It can't overemphasize one point or another. Yes? If it's error, it's not structural error, so how can you show prejudice sufficient to overcome the Brex standard? Well, it's a harmless error standard, but the burden where the harmless error standard applies is on the State, to show that the error is harmless beyond a reasonable doubt. There's been no hearing on this issue. This was the subject of a one-line denial on the Mr. Sabana's petition for rid of habeas corpus in the State court. It was denied by the California Supreme Court, and then the district court didn't hold a hearing on this issue either. So I think as to prejudice in general, unless you infer prejudice here, and I think you can, but if you don't, then there ought to be a district court hearing where evidence is taken, where we find out exactly what happened during those readbacks, and then figure out whether how the testimony that was actually read affects my client's guilt and participation in the crimes. And I would, and then we come to what's the evidence against my client? The evidence against my client was fairly weak. It was, they had nothing showing that he was actually at the scene of the crime. They had nothing, they had no surveillance tape. This video camera thing didn't pick him up. Nobody said he was there. There seemed to be almost a concession that he was intoxicated almost beyond belief when he was at Mr. Coe's home. And what really did him in was the second issue, which was the fact that the prosecutor was able to bring in the fact that he had tried to fabricate, tried to fabricate an alibi. So if you look at all the circumstantial evidence here, which is exactly what this readback testimony was about, it was about circumstantial evidence having to do with, among other things, you know, what was Jeffrey Subbana's placement at certain times, whether he was present, and so forth. And I submit that if it's not apparent that there is a problem here given the circumstantial nature and the fact that nobody was able to point to Jeffrey Subbana as a trigger man in this case, that at least this issue has got to go back or should go back for an evidentiary hearing before the district court to find out what really happened at that readback. It's inexcusable that the lawyer was not there to monitor what occurred. Now, as to the exploitation of the confession, which is the second issue, of course, that also plays to the same prejudice in that what really, I would contend, that tipped the scales against Jeffrey Subbana in this case was this recantation of the earlier alibi by the friend. Well, a jury can believe it. She says he comes in, he's wounded. He says he was wounded by some Mexicans. Why does he tell a story like that except that he's guilty? It's a perfectly fair inference. Well, I'm not arguing that the inference is unfair. Well, I know, but you're arguing this isn't enough to hang him. It was. No, I'm saying – no, no. Forgive me. Let me restate it. I'm saying the evidence was weak when you take that part out. But you're trying to exclude testimony that came three years after the so-called coerced recantation with the admittedly improper confession, illegally improper. So about three years went by, and what's to say, A, that that doesn't attenuate the taint, and, B, that she wouldn't have been found anyway? She wasn't exactly an unknown person, so sooner or later she would have come to their attention. And absent these events earlier, why wouldn't she have testified as to what went on? Well, she – the driving force that got her that sort of – it's kind of like a deposition. You take the testimony, you get it – you get somebody to say something, true or false, and then they're – normally they're repeated. They may be subject to some impeachment, but normally they're going to repeat it. Here, this whole incident, which occurred at the police station, occurred with great duress. Sabana was interrogated from 5 a.m. until 11 a.m. until they finally broke his will, got him to confess immediately after doing that. They went into another room. They went to this Langsabeth and said, guess what? He – or something to that effect. Guess what? He just confessed in this story about the Mexicans is untrue. Which it was. It was. I'm not denying that. Okay. I don't think anybody denied that. Three years later, she comes in and says it was untrue? Well, but the reason she came in – she – it was so untrue that – excuse me. It was so compelled that even the prosecutor conceded that they – that her initial statement that it was untrue, the one that she made at the police station, was tainted by the forced confession of Jeffrey Sabana. So what the courts – Sure. And there it was because it was proximate in time. What do we do with the – what's the effect of three years? I don't think three years has that much effect. So she's done. She's a recipient witness and she's no longer – she's now totally precluded from being used as a witness, even if she decides in her own mind that she's prepared to tell the truth. Three years have gone by. Things are all different now and she's going to come in and testify that he tried to get her to come up with a phony alibi. That's right. Yeah, I would – that's the position. The best case for that is? The best case is Elstad. Elstad. Right. What decision is that? Excuse me? Could you explain Elstad? Who decided that? When? The Supreme Court of the United States decided the Elstad case. I believe it was in the – I don't have the exact year, but I believe it was in the late 80s, early 90s. And what is it called? It holds that a – where there's a violation of Miranda, where there's a technical violation of the Miranda warnings that then leads to – then leads to the discovery of additional evidence that that – Discovery by the police? That's right. It's the cat out of the bag theory. That that is not – that holding it, that is not a violation of the defendant's Fifth Amendment rights. But Elstad goes on very clearly to say where it's an involuntary statement, that is, where it's not a technical violation of Miranda. They forgot to give the warning, or they gave the warning wrong. Or it's a case like this, where there's a purposeful – Is it dealing with the involuntary? No, it's dealing with the technical violation. The technical violation. Right. You know, we've been told by the Supreme Court, don't pay attention to our dicta. Well, but the court – yes. But the court has also held that – Also told by the statute to look at a holding by the Supreme Court. Yes. You apparently think this dicta is of some importance, but why? Well, because the standard for – the standard under the AEDPA is that – under Williams v. Taylor is that where the district court or the state court applies a standard that is contrary to Supreme Court precedent. Precedent or dicta? Precedent. All right. Where's the precedent? Well, the precedent is in Elstad and then also in the Ciccolini case, which also talks about – Talks about? Yes. That's – there is no case, Your Honor, and I'm not going to contend otherwise, that is directly on point. Elstad seems to say – well, it says directly that the relevant inquiry is the voluntariness of the second statement in these circumstances. So what on this record can you point to that would indicate that the second statement was not voluntarily made? The second statement being the statement in court? Yes. I can't – I can't point to anything. I realize you're talking in a slightly different context when you said that, but it seems to me that the inquiry may be somewhat the same. The – the – all we know – all we know from the record that we have before us is that she – she showed up in court. Her testimony appears to be somewhat tentative and reluctant, but she's there. We don't have – we don't have the sense that she's testifying in court involuntarily and voluntarily, but it's quite clear that the product, that is, the testimony that she's giving is the direct, whether it's three years or a year and a half or a week or two days, that it's the product of this – this sort of dog and cat confession scheme that the – that the police use in that police station. And there's just no way, I don't think, for anyone to say that – except the court, which may have the last word. The – there's no way for anyone to say that, you know, she was not locked into that at the time and that it's such a – it was such a simple proposition, that is, was the alibi true or was it false, that once she – she made that statement at the police station, that was something she was going to have to live with. And I don't believe that three years makes any difference at all. Thank you. Roberts. Morris Paytas for the penalty of the defendant. Going to the first issue raised regarding the absence from the readback by the defendant. This court has held that a defendant has no constitutionally established right to be present during a readback. That's LaCrosse versus Kerner. Fisher involves where – a situation in which the – both the defendant and the defendant attorney were not advised of the readback. It has nothing to do with this case. The defendant's counsel waived the presence, and the defendant has no established federal constitutional right to be present during the readback. Moreover, there was no prejudice. And that's because, first, Sibana – the evidence was very substantial with respect to his guilt. Sibana was seen at the café when the initial leader of this group, Hole, was shot. He gathered with the other defendants at a location when it was decided to go back to the café and seek to retaliate for the violence in connection with the shooting. He was seen going back with the co-defendants to the café. After the killing of the three victims, he returned with the other defendants and participants to the residence where they had originally gathered and left to go kill those people. When he returned to that location following the killings, he had a gunshot wound, and he was heard talking by a witness telling Langsavat – that's the woman who also testified three years later – he was heard talking to her about putting together a phony alibi. That's evidence that came in regardless of the testimony by Langsavat three years later. When he was arrested, he initially gave the police a phony alibi that was inconsistent with all the repeated testimony by everybody who testified with respect to his presence at the gathering after the shooting initially at the café and then later after the killings. So he was very well prosecuted with facts clearly and very convincingly showing that he was a participant in this three-man murder. With respect to the woman, the person who was asked to provide a phony alibi for him, Langsavat testified that Sabana had asked her to fabricate an alibi, an exclamation for his gunshot wound by telling the hospital that he'd been shot by Mexicans during some sort of street dispute and that they had earlier gone to a movie when all the shootings had occurred. She was exposed to his coerced statement and recanted or retracted what she had told the police, and three years later she testified. Before she testified three years later, again, there was independent evidence with respect to all the things that she was going to testify to. In other words, what she testified to was repeated by other evidence. But her testimony was awfully powerful. Pardon? Her testimony was pretty powerful against this defendant. Would you agree? I don't know that I wouldn't, Your Honor. The phony alibi, first of all, was already disclosed to the police by a witness who testified and whose statement was reported by the police officer who took the statement. One of the witnesses was named Mario Nguyen. He was present after the shooting when Sabana returned to the place where they had originally gathered, and he was wounded. And this witness told the police that he heard Sabana and this woman trying to fabricate, come up with an alibi about being shot. So the jury heard that from a separate witness. The jury also heard that he told the police before the coerced statement, he told the police that he had gone to the movies with this woman. It was false. His testimony that he was where he was was undisputed where he was, and he was not at a movie with her. Moreover. But all of that was very probative, obviously. I mean, we start off with comments were made about, well, there's no alibi witness here. There is at least an attempt at an alibi witness. Then she takes us down to, well, it was forced to be an alibi. True. She gave a statement, and then she retracted it, and then three years later she's called to testify. But even if her testimony, telling the truth, is somehow viewed as fruit of Sabana's coerced statement, her testimony was attenuated under established U.S. Supreme Court law, SECALIN. Three years had passed. Her identity was independently known to the police. They knew about her independent, unrelated to the coerced statement. Her testimony was voluntary. The prosecutor had stated on the record that he was not going to use her earlier false and retracted statement. There was no reason to rationally expect her, given the fact that there was already evidence showing that this alibi was fabricated, that she would, in fact, testify falsely. The problem, though, is when you start, I mean, that's why you use the fruit of the poisonous tree doctrine, that once you start violating Miranda and gathering evidence and then saying, well, we can find some way to get it in later, it's awfully tough to draw the line. Well, that's why there is an attenuation standard established by the United States Supreme Court that looks to the passage of time, that looks to the circumstances surrounding the reason why to defend that would be testifying. Remember. Other than I'll stand, what would you invoke for that proposition? The attenuation argument. What's the Supreme Court case? Saccolini. Saccolini. I mean, is there any real doubt that if this trial had occurred right away, within a month, that her testimony would surely have been excluded? Her testimony would have been excluded? Yes. I don't think so, because, first of all, if she testified, and I argued this in the brief, if her identification was unrelated to any coercion or any violation of the defendant's constitutional right, the police were talking to her before there was a violation of Sabana's constitutional right. They knew about it. She was a recipient. But she would not have said it, probably not have said anything, had she not been confronted with the coerced confession. If she was called to testify, why would she not testify truthfully? Well, let's back up. I guess what you're arguing is the inevitable discovery doctrine. And I just don't know that it goes so far as to include witnesses, potential witnesses. Well, we know the witness was discovered by the police independent of any coercion, any improper conduct. And we know also that the police obtained information that established that this alibi that was originally advanced was false. And we know that she would be testifying and having to swear under oath that she would testify truthfully. Under what established law, under what rule of law, civilized law, would any court assume that she would not testify truthfully? Well, I think the question is whether she would have been called at all. And I think probably not. If the police had no statement from her and you were simply calling her to the stand on the hope that you could impeach her, I doubt that she would have been called. Well, first of all, let me – Here's the problem, I guess, generically with these kinds of things, and I'm sure you're familiar with California v. Watts in which we had – there was a tape, a training tape for police used that says, well, here's how you get around Miranda. You tell – you violate Miranda. You tell the defendant you're going to violate Miranda. And then you can use it – A, you can use it to impeach him if he takes a stand. We can chill him from taking a stand. You can use it to take to other witnesses. You can use it for all these other purposes. And therefore, you should go ahead and violate Miranda in certain circumstances. And we said that gave rise in that particular case to cause of action. But that's the danger when we start allowing – when we start trimming down the fruit of the poisonous tree, Doc. Now, the attenuation argument is somewhat different. Three years have passed. She's testifying voluntarily. That has some force. But I don't know if she'd been testifying a month later that you could have said to make the same argument that you are here. Well, again, you know, if there's any uncertainty, I win. And that's one of the glories of representing the state on habeas corpus. And here, again, the witness, her identity, was not the result of any improper conduct. She was a precipient witness before the coerced statement. There's no reason to believe that she would not have been called independent regardless of whether that coerced statement had been taken. And, again, there is no case law anywhere that indicates that it's not presumed that she would have testified truthfully a month, a week, or three years later. On that note, I will submit. Thank you. As to the independent evidence of the alibi, there was, as the Attorney General states, there was a bit of evidence at the trial that people had overheard Subana and Langsabeth concocting this alibi. But it was from Sergeant Moore, who was repeating hearsay from other defendants. And one of those defendants was this Mario Nguyen, the same witness, who's been characterized as the squirrely one. And then another witness. And in that case, I think it was triple hearsay. So, you know, coming out of Sergeant Moore's mouth at the trial is a lot different than coming out of this Ms. Langsabeth's mouth, where she's the one who says in front of the jurors that this story was concocted. So I submit that the Attorney General's contention that there was enough evidence there to get this phony alibi, to have this phony alibi issue stick is probably very speculative. And, in fact, when one looks at this issue as a whole, it's coming out of Ms. Langsabeth's mouth that really makes the difference. She's sitting in front of that jury. Secondly, as to the legal standard, I just want to go back and pick up on something that Judge Thomas was just referring to, and that was the issue of these purposeful violations of Miranda. In Seaford v. Missouri, decided in 2004, the Supreme Court of the United States dealt with the situation where police tried to elicit a confession without giving Miranda warnings, get the confession, then give the Miranda warnings, and then have the defendant repeat, waive the Miranda rights, and repeat the confession that they already got. And Justice Souter, who wrote the plurality decision for the court, was quite clear that these roundabout means of trying to get around Miranda and break down the free will of the defendant are not going to be tolerated by the Supreme Court. And the key issue here was breaking down her free will. And the breaking down of the free will occurred in that police station as a result of forcing that confession out of Jeffrey Subban, and then taking it over to her. So whether it's – now I get to the taint. Whether it was three years or whether it was one month doesn't make a whole lot of difference because what the Supreme Court looks to is was it voluntary and was it the product of free will. But they also look at the passage of time. But in the context of the voluntariness of the – I mean, it's one of the factors. Thank you. Very good. Thank you, counsel. Thank you. That was our last argued case, and I think we should applaud our litigants here. And now you may be excused if you want. We will be pleased to take any questions that you have.
judges: Noonan, Thomas, Fisher